IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ERDAL AKOVA,

   Defendant.

CRIMINAL ACTION NO.:
1:12-cr-00220-ELR-JKL-2

## FINAL REPORT AND RECOMMENDATION

Defendant Erdal Akova, a Turkish national, is charged with participating in a scheme to export an epoxy manufactured in the Northern District of Georgia to the Islamic Republic of Iran in violation of U.S. trade sanctions against Iran. According to the indictment, the Iranian government uses the epoxy to repair helicopters it acquired before the Iranian Islamic Revolution in 1979.  Absent license and authorization from the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), it is illegal under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, *et seq.*, and the Iranian Transaction Regulations ("ITR"), 31 C.F.R. Part 560, to export such goods from the United States to Iran.  [Doc. 1 at 1-6.]

Count One of the indictment charges Akova with conspiracy to violate the IEEPA and the ITR in violation of the general conspiracy statute, 18 U.S.C. § 371. [Doc. 1 at 1-19.] Count Two charges Akova with exporting the epoxy to Iran through Turkey in violation of the IEEPA and the ITR, and aiding and abetting the same.[1] [Doc. 1 at 19.]

On September 8, 2016, Akova filed a "Motion to Declare 18 [sic] U.S.C. § 1705 Unconstitutional Due to Vagueness and as an Improper Delegation of Congressional Authority" (the "motion to dismiss"), in which Akova moves the Court to dismiss all counts of the indictment against him. [Doc. 34.] Akova contends that 50 U.S.C. § 1705, which imposes criminal penalties for violations of the IEEPA, is unconstitutional because (1) Congress's delegation of authority to the executive branch to issue regulations that define what constitutes criminal conduct violates the non-delegation doctrine; (2) the statute is impermissibly vague; and (3) Congress did not intend for the statute to apply extraterritorially. [Doc. 34 at 3-8.] Akova also moves to dismiss the conspiracy charge on the grounds that the general conspiracy statute, 18 U.S.C. § 371, does not apply

_____

[1] Defendants Keyvan Keshavarzi (an Iranian national) and Murad Tuncay (a Turkish national), Esa Kimya Metal San Ve Tic. Ltd. (a Turkish company 50% owned by Akova), and Utia Chem Company (an Iranian company) are also charged in Counts One and Two of the indictment.

2

extraterritorially.  [*Id.* at 8.]  The government has responded to the motion [Doc. 36], and Akova has filed a reply [Doc. 37].  For the following reasons I **RECOMMEND** that Akova's motion be **DENIED**.

I.      **Overview of the IEEPA and the ITR**

    A.      **The IEEPA**

Enacted in 1977, the IEEPA grants the President certain powers to "deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" that "has its source in whole or substantial part outside the United States[.]"  50 U.S.C. § 1701(a).  If the President declares a national emergency with respect to such a threat, he is authorized to regulate certain types of economic activities "under such regulations as he may prescribe, by means of instructions, licenses, or otherwise."  *Id.* § 1702(a).

The IEEPA requires the President to report to Congress when exercising power granted to him under the Act.  The President must consult with Congress "in every possible instance" before exercising powers granted under IEEPA and "immediately" provide Congress with a report detailing:

>    (1) the circumstances which necessitate such exercise of authority;

3

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

50 U.S.C. § 1703(a)-(b).

Then, after the President executes his or her authority under the IEEPA, he must "consult regularly with the Congress so long as such authorities are exercised." 50 U.S.C. § 1703(a). "At least once during each succeeding six-month period" following the initial exercise of any authority granted by the IEEPA, the President is required to report to Congress the actions taken since the last report and update any information previously reported to Congress. *Id.* § 1703(c). Congress also reserves the authority to terminate presidential authority under the IEEPA. *Id.* §§ 1622(b), 1706(b).

Congress also limited the types of transactions and economic activities that the President is authorized to regulate.  For example, the President may not issue regulations that impinge on personal communications, humanitarian aid, transactions incident to travel, or the free exchange of "information or informational materials."  50 U.S.C. § 1702(b).  Congress also limited criminal penalties under IEEPA to persons who "willfully commit[], willfully attempt[] to commit, or willfully conspire[] to commit" a violation of a regulation issued under the IEEPA.  50 U.S.C. § 1705(c).  The IEEPA also exempts those who act in "good faith" reliance on Act, or on "any regulation, instruction, or direction" issued under IEEPA.  *Id.* § 1702(a)(3).

## B.     The Iranian Transactions Regulations

The Iranian Transactions Regulations, codified at 31 C.F.R. part 560, implement a series of Executive orders that began with Executive Order 12613, which President Ronald Reagan issued on October 29, 1987, prohibiting the importation of Iranian-origin goods and services.  *See* Exec. Order No. 12613, 52 FR 41940 (Oct. 29, 1987).  In 1995, President William J. Clinton declared that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the

5

United States," and ordered sanctions prohibiting the export to, financing of, and investment in Iran.  Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995); Exec. Order No. 12959, 60 Fed Reg. 24757 (May 6, 1995); Exec. Order No. 13059, 62 Fed. Reg. 44531 (Aug. 19, 1995).

Pursuant to those orders, the Secretary of the Treasury issued the ITR. Section 560.204 of the ITR prohibits "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran."  31 C.F.R. § 560.204 (2012).  The version of Section 560.203 in effect during the time relevant to the conduct alleged in the indictment prohibited: "Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part."[2]  31 C.F.R. § 560.203 (2012).

_____

[2] Effective October 22, 2012, after the indictment was returned in this case, the OFAC changed the name of the ITR to "the Iranian Transactions and Sanctions Regulations" and significantly revised and added regulations to implement Executive Order 13599 and subsections 1245 (c) and (d)(1)(b) of the National Defense Authorization Act of 2012.  *See* Iranian Transactions Regulations, 77 Fed Reg. 64664-01 (Oct. 22, 2012).  The amendment resulted in changes to 31 C.F.R. §§ 560.203 and 560.204 effective October 22, 2012, after

## II.    Analysis

### A.    The IEEPA Does Not Unconstitutionally Delegate Power to the Executive Branch.

Akova argues that the IEEPA is unconstitutional under the non-delegation doctrine because Congress improperly delegated authority to the executive branch to define the elements of criminal offenses by regulation.  [Doc. 34 at 3, 7-8.] The government counters that Congress's delegation of authority was proper because the IEEPA limits the President's power and imposes procedural limitations that meaningfully constrains the President's discretion to define criminal conduct.  [Doc. 36 at 4-7.]

The government has the better argument.  "The non-delegation doctrine is the constitutional principle that prevents Congress from delegating its legislative authority to another body with 'unfettered discretion to make whatever laws' the body sees fit."  *Eternal Word Television Network, Inc. v. Sec. of U.S. Dept. of Health & Human Servs.*, 818 F.3d 1122, 1137 n.15 (11th Cir. 2016) (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537-38 (1935)). Rooted in the principle of preserving the separation of powers between the

the time of the actions alleged in the complaint.  My analysis therefore focuses on the pre-October 22, 2012 versions of those regulations, which were last codified in the 2012 edition of Title 31 of the C.F.R.

coordinate branches of government, the doctrine is derived from Article 1, Section 1 of the Constitution, which states that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1; *United States v. Ambert*, 561 F.3d 1202, 1212-13 (11th Cir. 2009).

To determine the constitutionality of Congress's delegation of authority to another branch of government, a court must consider whether "Congress has provided an 'intelligible principle' for the recipient of the delegated authority to conform to, the legislative action will not amount to a forbidden delegation of legislative power." *Ambert*, 561 F.3d at 1213 (citing *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928)). Relevant factors under this test include whether Congress delineated the general policy to be served, identified the public agency which is to apply it, and set boundaries of the delegated authority. *Id.* (citing *Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 105 (1946)). Non-delegation challenges are rarely successful. "Indeed, since 1935, the Supreme Court has not struck down a single statute as an impermissible delegation of legislative power." *Id.*

8

It appears that although the U.S. Court of Appeals for the Eleventh Circuit has not addressed whether the IEEPA violates the non-delegation doctrine, all the courts of appeal that have considered a non-delegation challenge to the IEEPA have upheld the constitutionality of the Act.  *See United States v. Mirza*, 454 F. App'x 249, 255-56 (5th Cir. 2011) (unpublished); *United States v. Amirnazmi*, 645 F.3d 564, 575-77 (3d Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 215-17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092-94 (4th Cir. 1993).   A number of district courts have similarly rejected non-delegation challenges under the IEEPA.  *See, e.g., United States v. Nazemzadeh*, No. 11 CR 5726 L, 2014 WL 310460, at *8 (S.D. Cal. Jan. 28, 2014) (holding that IEEPA does not violate the non-delegation doctrine); *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821, 829-30 (N.D. Ohio 2005) (same); *see also, e.g., United States v. Vaghari*, Crim. A. No. 08-693-01-02, 2009 WL 2245097, at *1 (E.D. Pa. July 27, 2009) (collecting cases).

I find the forgoing cases persuasive, and I too conclude that because the IEEPA meaningfully constrains the President's powers, it does not violate the non-delegation doctrine.  The IEEPA clearly sets out the policy behind delegating power to the President, namely, to "deal with any unusual and extraordinary

threat, which has its source in whole or substantial party outside the United States." 50 U.S.C. § 1701(a); *Mirza*, 454 F. App'x at 256. The Act also restricts the circumstances under which the President can exercise authority. "To activate IEEPA, the President must find that an 'unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States' originating on foreign soil has reached 'national emergency' proportions." *Amirnazmi*, 645 F.3d at 576. The IEEPA also exempts certain transactions (including, among other things, personal communications, humanitarian aid, and news feeds) from regulation as well as those who act in good faith. 50 U.S.C. § 1702(a)(3), (b); *Amirnazmi*, 645 F.3d at 576. It also bears mentioning that the IEEPA relates to foreign affairs, "an area in which the President has greater discretion." *See Dhafir*, 461 F.3d at 217.

The IEEPA also sets out procedural requirements that ensure Congress's continued involvement. Before exercising the power conferred by the IEEPA, the President is generally required to consult with Congress. 50 U.S.C. § 1703(a) Then, whenever the President exercises any of the powers granted by the IEEPA, the President is required to report to Congress and periodically provide follow-up reports to Congress to reaffirm the necessity of the executive's actions. *Id.* §

1703(b), (c).  Congress also retains the power to terminate of the declaration of emergency, and thus end the President's authority under the Act.  *Id.* §§ 1701(b), 1706.  Considering those procedural restrictions and Congress's clear articulation of the principles and policies that govern the President's authority, I conclude that the IEEPA is not an unconstitutional delegation of legislative power.[3]

---

[3] In his reply, Akova questions whether the United States is in a state of "national emergency" with Iran, since the "emergency" has lasted over 30 years, and he urges the Court to "revisit the propriety of this law."  [Doc. 37 at 2.] According to Akova, the national relationship with Iran is neither "unusual" nor "extraordinary" and that there must be an "outer limit" with respect to what can reasonably be described as an emergency."  [*Id.*]  Akova also speculates that the executive branch has not "meaningfully complied" with the procedural restraints. [*Id.* at 3.]  I find these arguments unpersuasive.  As discussed above, Congress imposed reporting requirements on the President, and Congress ultimately has the authority to terminate the declaration of an emergency.  Thus, the mere fact that the "national emergency" with respect to Iran endures after 30 years is not something that this Court is prepared to "revisit."  Moreover, Akova cites no authority or evidence to suggest that the President has failed to comply—much less "meaningfully" comply—with the periodic reporting requirements of the Act. Nor does he cite any authority to support his assumption that the government bears the burden of showing its compliance with the procedural requirements in order establish the IEEPA's constitutionality.  Indeed, my own research indicates that the burden is on Akova, as the party challenging the constitutionality of the Act, to establish a constitutional violation.  *See Dhafir*, 461 F.3d at 218 ("[C]ase law does not support the idea that the government bears the burden of proving its compliance with a statute in order to establish the statute's constitutionality.").  In sum, I find Akova's arguments in his reply brief unpersuasive.

## B.    The IEEPA Is Not Unconstitutionally Vague.

Akova argues that the IEEPA is unconstitutionally vague because he had not read 50 U.S.C. § 1705, and that even if he had read the statute, the statute is so vague that he would not have understood that "it is illegal for a foreign citizen to order an epoxy from a United States business for an Iranian customer." [Doc. 34 at 4.]  In support of his argument, Akova points out that when he was arrested, he was in the United States on vacation, and had given his complete travel itinerary to U.S. customs officials.  [*Id.*]  Akova maintains that had the statute given him "fair notice" of what was prohibited, he would not have entered the United States, much less provided accurate customs information to the government.  [*Id.* at 4-5.]  Akova does not challenge particular language of the IEEPA or the ITR as vague or ambiguous; rather, he simply argues by assertion that 50 U.S.C. § 1705 is vague because it "simply does not provide fair notice of what is prohibited or that any action by a foreign citizen is prohibited." [*Id.* at 4.]

"The void-for-vagueness doctrine prohibits the government from imposing sanctions 'under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Welch v. United States*, 578 U.S. __, 136 S. Ct. 1257, 1262 (2016) (quoting *Johnson v. United States*, 576 U.S. __, 135 S. Ct. 2551, 2556 (2015)).

12

"The root of the vagueness doctrine is a rough idea of fairness.  It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited."  *Colten v. Kentucky*, 407 U.S. 104, 110 (1972).  The constitution is violated only when a statute is so vague that "persons of common intelligence must necessarily guess at its meaning and differ as to its application."  *United States v. Hooshmand*, 931 F.2d 725, 732 (11th Cir. 1991) (internal quotation marks omitted).  "There is a strong presumption that statutes passed by Congress are valid."  *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010).

Courts have "uniformly rejected" Akoval's argument that the IEEPA fails to provide fair notice as to what conduct is prohibited.  *Vaghari*, 2009 WL 2245097, at *2; *see also United States v. Quinn*, 401 F. Supp. 2d 80, 100 (D.D.C. 2005); *Anvari-Hamedani*, 378 F. Supp. 2d at 829.  I find unconvincing Akova's contention that no one could understand that it is illegal for a foreign citizen to export and transship materials from the United States to an Iranian customer.  The IEEPA and OFAC regulations (including the ITR) "govern the activities of

relatively sophisticated individuals who are deliberately engaged in international commerce and, therefore, must be familiar with (if not expert in) various legal regimes-*e.g.*, customs duties and tariffs-in multiple countries." *Quinn*, 401 F. Supp. 2d at 100.[4]

In addition, the penalty provision of the IEEPA contains a scienter requirement, which may "mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also Abdulqader v. United State*s, No. 3:04-CR-0240-P, 2015 WL 1551080, at *19 (N.D. Tex. Apr. 7, 2015) (rejecting claim that IEEPA is unconstitutionally vague and noting that "a requirement of willfulness makes a vagueness challenge especially difficult to sustain"). Section 1705, provides in relevant part that:

> A person who ***willfully*** commits, ***willfully*** attempts to commit, or ***willfully*** conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall, upon conviction, be fined not more

---

[4] To the extent that Akova argues that 50 U.S.C. § 1705 is unconstitutionally vague because it refers to other statutes and implementing regulations, I reject that argument as well. While "putting together the pieces of this regulatory puzzle is not easy," the statutory provisions and regulations, when read together, "adequately provide for principled enforcement by making clear what conduct of the defendant violates the statutory scheme." *See United States v. Guo*, 634 F.3d 1119, 1122-23 (9th Cir. 2011).

> than $1,000,000, or if a natural person, may be
> imprisoned for not more than 20 years, or both.

50 U.S.C. § 1705(c) (emphasis added). If the government fails to prove beyond a

reasonable doubt that Akova "willfully" conspired to commit the alleged

violation of the IEEPA and ITR or "willfully" attempted to commit the alleged

violation of the IEEPA and ITR, then the jury must acquit him of those charges.

But his self-professed ignorance of the law does render the statute

unconstitutional. *See Vaghari*, 2009 WL 2245097, at *2 ("As § 1705(c) imposes

a willfulness requirement, IEEPA and the related Executive Orders and OFAC

regulations are not unconstitutionally vague."). Accordingly, I conclude that

Akova's challenge to the IEEPA on vagueness grounds fails.

### C.    The IEEPA Applies Extraterritorially.

Akova argues that the IEEPA does not apply extraterritorially because

Congress did not prohibit a foreign national from ordering U.S. goods for an

Iranian customer, and "did not did not expressly authorize the rule makers to

declare the actions of foreign nationals to be a violation of this United States law."

[Doc. 34 at 3, 5-7.] I reject this argument.

Congress has the authority to enforce its laws beyond the territorial

boundaries of the United States. *United States v. Plummer*, 221 F.3d 1298, 1304

(11th Cir. 2000).  The threshold inquiry for determining whether a statute may be utilized to prosecute conduct that takes place outside the United States is whether Congress intended the statute to have extraterritorial application.  *See United States v. Bowman*, 260 U.S. 94, 97-98 (1922).  Deciding Congress intended for the law to apply extraterritorially is a question of statutory interpretation.  *Plummer*, 221 F.3d at 1304.

"Generally, courts will give extraterritorial effect to penal statutes where congressional intent is clear."  *United States v. MacAllister*, 160 F.3d 1304, 1307 (11th Cir. 1998).  But "Congress need not expressly provide for extraterritorial application of a criminal statute if the nature of the offense is such that it may be inferred."  *Id.* at 1307-08.  Congressional intent to provide for extraterritorial jurisdiction has been found, for example, where foreign offenses require some action in a foreign country or the offenses cause domestic harm.  *Id.* at 1308; *see also Plummer*, 221 F.3d at 1304 ("[C]ourts in this Circuit and elsewhere have routinely inferred congressional intent to provide for extraterritorial jurisdiction over foreign offenses that cause domestic harm.").

I readily conclude that Congress intended for the IEEPA to apply extraterritorially.  The purpose of the law is to protect national security—a fact

made clear by the name of the act itself: the **International** Emergency Economic Powers Act.  The text of the IEEPA similarly expresses Congress's intent to deal with **international** threats to the national security, foreign policy, and the economy of the United States.  50 U.S.C. § 1701, which set out the purpose of the Act, provides:

> Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

50 U.S.C. § 1701(a).  Similarly, 50 U.S.C. § 1702(a) authorizes the President to issue regulations to control international trade, including to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

17

Likewise, the ITR broadly prohibits anyone, directly or indirectly, from engaging in or facilitating trade between the United States and Iran, including through third countries. *See* 31 C.F.R. § 560.204. International trade, like drug smuggling, which the Eleventh Circuit has described as "quintessentially an international crime," involves acts committed, at least in part, outside the United States. *See Plummer*, 221 F.3d at 1305. It would be illogical to conclude that Congress intended only to prohibit individuals on U.S. soil or U.S. citizens abroad from trading with Iran, but allow foreign persons to export goods from the U.S. to trade with Iran and harm the national security interests of the United States.

Although not argued by either party, under precedent in this Circuit the Court must also "consider whether [giving extraterritorial effect to the IEEPA] would violate general principles of international law." *MacAllister*, 160 F.3d at 1308; *see also United States v. Frank*, 599 F.3d 1221, 1233 (11th Cir. 2010). International law recognizes the following principles under which the exercise of extraterritorial criminal jurisdiction may be appropriate: (1) the nationality principle, under which jurisdiction is based on the nationality or national character of the offender; (2) the territorial effects principle, under which

18

jurisdiction is asserted over acts performed outside the United States that produce detrimental effects within the United States; (3) the protective principle, under which jurisdiction is asserted over foreigners for acts committed outside the United States that may impinge on the territorial integrity, security, or independence of the United States; (4) the universal principle, under which jurisdiction is extended over extraterritorial acts so heinous as to be universally condemned; and (5) the passive personality principle, under which jurisdiction is based upon the nationality of the victim.  *See United States v. Williams*, 722 F. Supp. 2d 1313, 1318 & nn. 6-10 (M.D. Ga. 2010), *aff'd*, 509 F. App'x 899 (11th Cir. 2013); *United States v. Clark*, 315 F. Supp. 2d 1127, 1131 (W.D. Wash. 2004) (citing *United States v. Vasquez-Velasco*, 15 F.3d 833, 840 n.5 (9th Cir. 1994)), *aff'd*, 435 F.3d 1100 (9th Cir. 2006); *see also Rivard v. United States*, 375 F.2d 882, 885 (5th Cir. 1967); Restatement (Third) of Foreign Relations of Law § 402 cmt. a (1987).  Satisfaction of only one of these principles is required. *MacAllister*, 160 F.3d at 1308 n.9; *see* Restatement (Third) of Foreign Relations Law § 402 cmt. b.

Applying the IEEPA extraterritorially would not offend international law, at least under protective principle.  The alleged acts of Akova—exporting, from

19

the United States to Iran, an epoxy that may be used to repair military helicopters and conspiring with others to do the same—create a detrimental effect in the United States and impinge on the national security. *See United States v. Romero-Galue*, 757 F.2d 1147, 1154 (11th Cir. 1985) ("The protective principle permits a nation to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security or could potentially interfere with the operation of its governmental functions."); *accord United States v. Yousef*, 327 F.3d 56, 110 (2d Cir. 2003) ("The protective . . . principle permits a State to assume jurisdiction over non-nationals for acts done abroad that affect the security of the State."). *See generally* Restatement (Third) of Foreign Relations Law § 402 cmt. f.   Accordingly, I find no international law impediment to applying the IEEPA and the ITR extraterritorially in this case.

Akova's remaining arguments on this issue are not persuasive.  He argues that the IEEPA-authorized sanctions "do not purport to limit the entire world" and that the "IEEPA self-evidently does not apply, for example, to a Turkish citizen's decision to work for an Iranian bank or a Chinese company's purchase of Iranian oil." [Doc. 34 at 5-6.]  But Akova's hypothetical bears little resemblance to the facts of this case.  This is not a case where a foreign national has merely engaged

in commercial trading with a nation against which the United States has imposed trade sanctions.  Rather, Akova is charged with acting a middleman to facilitate the exportation of goods from the United States to Iran—conduct that falls squarely into what § 560.204 prohibits.  Likewise, Akova's contention applying the IEEPA and the ITR extraterritorially would constitute a "blockade" misses the mark because the IEEPA and the ITR do not bar all foreign trade with Iran.  The ITR prohibits, among other things, "exportation, reexportation, sale or supply, directly or indirectly, *from the United States*" to Iran.  31 C.F.R. § 560.204.

Akova also argues that the language of § 560.204 refers only to persons acting within the United States or any "United States person,"[5] and that the regulation must be read to exclude foreign nationals acting outside the territory of the United States.  [Doc. 34 at 6-7.]  Section 560.204 does not support such a narrow interpretation.  Section 560.204 prohibits "the exportation, reexportation, sale or supply, directly or indirectly, from the United States, *or by a United States person, wherever located*, of any goods, technology, or services . . . ." (emphasis added).  A New York federal district court rejecting this very argument observed,

_____

[5] The regulations define the term "United States person" as "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States." 31 C.F.R. § 560.314 (2012).

21

"[t]he disjunctive 'or' indicates that the prohibition reaches domestic activities by anyone, whether or not a 'U.S. person,' and that it also reaches foreign activities when conducted by a 'U.S. person.'"  *United States v. All Funds on Deposit in United Bank of Switz.*, No. 01 CIV. 2091 (JSR), 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003); *see also United States v. Zarrab*, No. 15 CR 867 (RMB), slip op. at 20 (S.D.N.Y. Oct. 17, 2016) (Doc. 90) ("The prohibition set out in [§ 560.204] is not directed against (only) 'a United States person,' but also includes certain conduct emanating 'from the United States.'").  I find that interpretation of § 560.204 correct, and I too reject Akova's argument.  Here, even though Akova and his co-defendants are not "United States persons," Akova's alleged actions are prohibited under § 560.204 as he is charged with conspiring and attempting to export goods from the United States to Iran via Turkey.  [Doc. 1 ¶¶ 17, 21.]  This alleged conduct falls squarely into the scope of § 560.204's prohibition on "the exportation, reexportation, sale or supply, directly or indirectly, from the United States" to Iran.[6]

---

[6] Likewise, § 560.203 prohibits ***any*** transaction "within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in [31 C.F.R. pt. 560]," and not just transactions involving "United States persons."  31 C.F.R. § 560.203 (2012).  The indictment alleges that Akova and the other defendants engaged in transactions

Akova's reliance on an OFAC guidance paper is similarly misplaced.  [*See* Doc. 34 at 7.]  In that guidance paper, the OFAC addressed whether a United States supplier of goods would be in violation of § 560.204 where one its foreign distributors, in which it held an indirect ownership interest, was supplying the goods to Iran.[7]  The OFAC's response to that narrow question dealt solely with the potential liability of the U.S. supplier for the acts of its foreign subsidiary. The agency did not explicitly address whether the foreign distributor may be in violation of § 560.204—and the OFAC certainly did not take the position that the distributor was ***not*** in violation of the regulation.

In sum, I conclude that although Akova is a Turkish national whose conduct allegedly occurred overseas, he may be charged criminally with violations of the IEEPA.

**D.	The Conspiracy Count Is Not Unconstitutional.**

Akova contends that Count One of the indictment, which charges him under 18 U.S.C. § 371 to violate the IEEPA and the ITR, should be dismissed

---

within the United States.  [*See* Doc. 1 at 8, 19 (alleging that defendants acted "within the Northern District of Georgia and elsewhere").]  In fact, the entire scheme is premised on the exportation of goods from the United States and the transshipment of the goods through third countries (including Turkey) to Iran.

[7]	*See*	https://www.treasury.gov/resource-center/sanctions/Programs/Documents/iranship.pdf (last accessed, October 28, 2016).

because § 371 does not apply extraterritorially.[8]  As explained above, the IEEPA and the ITR apply extraterritorially; thus, it follows that the conspiracy charged, predicated on alleged violations of the IEEPA and the ITR, likewise has extraterritorial application.  *United States v. Belfast*, 611 F.3d 783, 813 (11th Cir. 2010) ("[E]xtraterritorial jurisdiction over a conspiracy charge exists whenever the underlying substantive crime applies to extraterritorial conduct").

But Akova's argument also fails for the more basic reason that indictment alleges a domestic nexus between Akova and his co-conspirators' conduct and the United States.  *See Zarrab*, slip op. at 17-18 (citing *United States v. Mostafa*, 965 F. Supp. 2d 451, 469 (S.D.N.Y. 2013)).  The alleged scheme is based on the exportation and transshipment of U.S. goods through Turkey and on to Iran, and the indictment alleges that Akova's codefendants engaged in overt acts directly within the United States.  For example, defendants Keshavarzi and Tuncay allegedly directly contacted the manufacturer of the epoxy (or an undercover agent posing as the manufacturer) in the United States, and Akova's company,

---

[8] 18 U.S.C. § 371 provides in pertinent part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

Esa Kimya, transferred bank funds to a bank account in Atlanta, Georgia.  [Doc. 1 at 14, 16, 18.]   A defendant who is charged with being a participant in a conspiracy, even if he committed no act within the United States, is subject to prosecution in this country so long as one of the conspirators commits an overt act in furtherance of that conspiracy within the territory of the United States.  *See MacAllister,* 160 F.3d at 1307.  Since overt acts that formed part of the conspiracy allegedly occurred in the United States, I reject Akova's argument against applying 18 U.S.C. § 371 extraterritorially.  *See Zarrab*, slip op. at 17-18.

## III.    Conclusion

For the foregoing reasons, I **RECOMMEND** that Akova's "Motion to Declare 18 [sic] U.S.C. § 1705 Unconstitutional Due to Vagueness and as an Improper Delegation of Congressional Authority" [Doc. 34] be **DENIED**.

There are no pending matters before me,[9] and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

---

[9] Akova's Motion for a *Jackson v. Denno* Hearing and to Suppress Statements [Doc. 33], the only other pending motion, has been deferred to the District Judge.  [*See* Doc. 35.]

IT IS SO RECOMMENDED this 28th day of October, 2016.

JOHN K. LARKINS III
United States Magistrate Judge